145 F.3d 1303
 46 U.S.P.Q.2d 1752
 CHIUMINATTA CONCRETE CONCEPTS, INC., Edward Chiuminatta, and
Alan R. Chiuminatta, Plaintiffs-Appellees,
v.
CARDINAL INDUSTRIES, INC. and Green Machine Corporation,
Defendants-Appellants,
and
Allen Engineering Corporation, Defendant.
 Nos. 97-1194, 97-1401.
 United States Court of Appeals,
Federal Circuit.
 Decided May 14, 1998.
Rehearing Denied; Suggestion for Rehearing In Banc
Declined July 2, 1998.
 
 Karen Vogel Weil, Knobbe, Martens, Olson & Bear, LLP, Newport Beach, CA, argued for plaintiffs-appellees. On the brief were James F. Lesniak, Paul A. Stewart, and Michael K. Friedland.
 Joseph F. Posillico, Synnestvedt & Lechner, Philadelphia, PA, argued for defendants-appellants. On the brief was Gary A. Hecht.
 Before MICHEL, PLAGER, and LOURIE, Circuit Judges.
 LOURIE, Circuit Judge.
 
 
 1
 Cardinal Industries, Inc. and Green Machine Corporation (collectively Cardinal) appeal from the decision of the United States District Court for the Central District of California granting Chiuminatta Concrete Concepts, Inc., Edward Chiuminatta, and Alan Chiuminatta's (collectively Chiuminatta's) motion for partial summary judgment of infringement of two of Chiuminatta's patents. Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc., Docket No. CV 95-4995 (C.D.Cal. Nov. 7, 1996). Cardinal also appeals from the district court's decision dismissing its affirmative defenses of patent invalidity and unenforceability and releasing the preliminary injunction bond following the entry of a permanent injunction on December 12, 1996.
 
 
 2
 The district court found that Cardinal infringed claim 11, an apparatus claim, of U.S. Patent B1 5,056,499 and infringed claims 1, 2, and 3, all method claims, of U.S. Patent B1 4,889,675. The court further concluded that the patents were neither invalid nor unenforceable. Because the district court erroneously construed a means-plus-function limitation of the apparatus claims, we reverse the summary judgment of infringement of that patent. We affirm the decision in all other respects.
 
 BACKGROUND
 
 3
 Chiuminatta owns two patents, the '499 patent and the '675 patent relating to an apparatus and method, respectively, for cutting concrete before it has completely cured to a hardened condition. The apparatus claims are directed to a rotary saw that has two significant features. First, the leading edge of the saw rotates in an upward direction so as to prevent the accumulation of displaced wet concrete in the groove created behind the saw. Second, a support surface applies downward pressure at the point where the saw blade emerges from the concrete in order to prevent the upwardly rotating blade from damaging the concrete (commonly referred to as raveling, chipping, spalling, or cracking).
 
 
 4
 Claim 11 of the '499 patent (the sole apparatus claim on appeal) reads, with emphasis added, as follows:
 
 
 5
 A saw for cutting concrete even before the concrete has hardened to its typical, rock-like hardness, comprising:a circular concrete cutting blade having sides and a leading cutting edge;
 
 
 6
 a motor connected to rotate the concrete cutting blade in an up-cut rotation;
 
 
 7
 means connected to the saw for supporting the surface of the concrete adjacent the leading edge of the cutting blade to inhibit chipping, spalling, or cracking of the concrete surface during cutting;
 
 
 8
 wheel means for movably supporting the saw on the surface of the concrete during cutting.
 
 
 9
 As illustrated in the following figure adapted from the patent, the only structure disclosed for supporting the surface of the concrete is a skid plate.
 
 
 10
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 11
 ----------
 
 
 12
 The written description summarizes the invention, stating:
 
 
 13
 An apparatus is provided for cutting a groove in soft concrete. The apparatus can cut the concrete anytime after the concrete is finished and before the concrete attains its rock like hardness
 
 
 14
 ....
 
 
 15
 The soft concrete saw has a base plate on which are mounted two wheels and a skid plate , each of which contacts the concrete to provide three point support on the concrete.... The saw blade extends through a ... slot in the skid plate, in order to project into and cut the concrete below the skid plate.
 
 
 16
 The dimensions of the slot in the skid plate are selected to support the concrete immediately adjacent the saw blade so as to prevent cracking of the concrete as it is cut.
 
 
 17
 '499 patent, col. 3, ll. 8-27.
 
 
 18
 Cardinal manufactures and sells the accused device, the Green Machine TM saw. It, too, uses a rotary blade that rotates upward at its leading edge. Additionally, as illustrated above, the accused device has two small wheels mounted adjacent to the leading edge of the saw blade . Cardinal concedes that these wheels support the surface of the concrete in order to prevent chipping, spalling, or cracking.
 
 
 19
 Cardinal also appeals the summary judgment of infringement of the asserted method claims of the '675 patent. Claim 3, which is representative of the asserted claims, reads, with emphasis added, as follows:
 
 
 20
 A method of cutting grooves in concrete, comprising the steps of:
 
 
 21
 ...
 
 
 22
 cutting a groove in the surface with a rotating blade having an up-cut rotation and having a cutting edge and sides, the cutting occurring before the concrete has hardened sufficiently to allow cutting by a conventional abrasive concrete saw, while still producing an acceptable surface finish ... the cutting step occurring when the concrete has a hardness such that a 1.125 inch diameter steel rod with a flat end, and weighing about 5.75 pounds, would cause an indentation in the surface of the concrete of about 1/32 to 1/2 of an inch when the rod is dropped from a height of about 24 inches above the surface of the concrete; and supporting the surface immediately adjacent the sides of the cutting blade....
 
 
 23
 It is undisputed that the wheels in the accused device meet the "supporting the surface" step of the claimed method. However, Cardinal asserts that the accused device in normal commercial use does not perform the cutting step under the claimed conditions.
 
 
 24
 The district court ruled in favor of Chiuminatta. It held that (1) Cardinal's manufacture and sale of the accused device infringed claim 11 of the '499 patent, (2) Cardinal's manufacture and sale of the accused device induced infringement of method claims 1, 2 and 3 of the '675 patent, (3) the '675 patent had not been shown to be invalid under 35 U.S.C. § 103 for obviousness, and (4) the '675 patent is not unenforceable. The district court then granted Chiuminatta's motion for a permanent injunction and released Chiuminatta's preliminary injunction bond. Cardinal appeals each of the rulings to this court. We have jurisdiction pursuant to 28 U.S.C. § 1292(c)(1) (1994).
 
 DISCUSSION
 
 25
 We review a district court's grant of summary judgment de novo. Conroy v. Reebok Int'l, Ltd., 14 F.3d 1570, 1575, 29 USPQ2d 1373, 1377 (Fed.Cir.1994). Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Thus, summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In determining whether there is a genuine issue of material fact, the evidence must be viewed in the light most favorable to the party opposing the motion, with doubts resolved in favor of the opponent. Transmatic, Inc. v. Gulton Indus., Inc., 53 F.3d 1270, 1274, 35 USPQ2d 1035, 1038 (Fed.Cir.1995).
 
 A. The '499 Patent
 1. Literal Infringement
 
 26
 Cardinal asserts that the district court erred by granting Chiuminatta's motion for summary judgment of infringement of claim 11 of the '499 patent and that the court erroneously construed the means limitation in that claim to include every conceivable support surface. Cardinal concedes that the accused device meets every claim limitation except the "means ... for supporting the surface of the concrete." However, Cardinal argues that under a proper analysis, that means limitation should be construed as corresponding only to the disclosed skid plate and to structures that are equivalent to that skid plate. An equivalent structure, argues Cardinal, is one that includes the essential structural components of the disclosed apparatus. Cardinal identifies in its brief the key essential structural component as a "hard plate fixedly mounted to the base of the saw," although Cardinal concedes that the particular shape of the plate and its means for attachment are not essential.
 
 
 27
 Chiuminatta responds that the district court correctly construed the means-plus-function limitation and properly concluded as a matter of law that the limitation reads on the accused device. Specifically, Chiuminatta argues that the limitation was properly construed as being broader than the disclosed skid plate to encompass any "support surface." Chiuminatta asserts that the court correctly premised its infringement finding on the observation that "both [the structure in the patent and the wheels of the accused device] consist of flat planes on either side of the saw blade which hold the concrete in place."
 
 
 28
 We must determine whether the district court erred in concluding that the means limitation reads on the accused device as a matter of law. Neither party argues that there are disputed fact questions regarding the accused device. Both parties agree that the means-plus-function clause is the only limitation in dispute and that all other limitations are met by the accused device. What they dispute is whether the scope of the means clause is broad enough to encompass wheels such as those on the accused device.
 
 
 29
 A means-plus-function limitation contemplated by 35 U.S.C. § 112, p 6 (1994) recites a function to be performed rather than definite structure or materials for performing that function. Such a limitation must be construed "to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." Id. "To determine whether a claim limitation is met literally, where expressed as a means for performing a stated function, the court must compare the accused structure with the disclosed structure, and must find equivalent structure as well as identity of claimed function for that structure." Pennwalt Corp. v. Durand-Wayland, Inc., 833 F.2d 931, 934, 4 USPQ2d 1737, 1739 (Fed.Cir.1987) (in banc) (emphasis in original). A determination of the claimed function, being a matter of construction of specific terms in the claim, is a question of law, reviewed de novo. See Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 46 USPQ2d 1169 (Fed.Cir.1998) (in banc); Markman v. Westview Instruments, Inc., 52 F.3d 967, 979, 34 USPQ2d 1321, 1329 (Fed.Cir.1995) (in banc), aff'd, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577, 38 USPQ2d 1461 (1996). Likewise, the "means" term in a means-plus-function limitation is essentially a generic reference for the corresponding structure disclosed in the specification. Accordingly, a determination of corresponding structure is a determination of the meaning of the "means" term in the claim and is thus also a matter of claim construction. See B. Braun Med., Inc. v. Abbott Lab., 124 F.3d 1419, 1424-25, 43 USPQ2d 1896, 1899-1900 (Fed.Cir.1997) (determining de novo which structures disclosed in the specification corresponded to the means limitation); cf. Markman, 52 F.3d at 977 n. 8, 34 USPQ2d at 1327 n. 8 (reserving only the question whether a determination of equivalence under § 112, p 6 is a question of law or fact). Cardinal argues that the district court erroneously identified as the disclosed structure broad functional language in the specification rather than physical structure. Chiuminatta responds that the passage identified by the district court, a "support surface or plate ... in movable contact with the surface of the concrete," is indeed structure. We agree with Cardinal that the court misidentified the corresponding structure. The function recited in the means clause of claim 11 is "supporting the surface of the concrete adjacent to the leading edge of the cutting blade to inhibit chipping, spalling, or cracking of the concrete surface during cutting."
 
 
 30
 The specification clearly identifies the structure performing that function as the skid plate, which is the only embodiment of the "support surface" disclosed in the specification:
 
 
 31
 A support surface or plate is in movable contact with the surface of the concrete 13 in order to support the surface of the concrete immediately adjacent the groove being cut in the concrete 13. In the illustrated embodiment, this surface takes the form of a skid plate 24 which depends from the base plate 12 in the direction of the concrete 13.
 
 
 32
 The structure of the skid plate is broadly described in the specification of the '499 patent as follows:
 
 
 33
 a generally rectangular strip of metal having rounded ends 26 and 28 between which is a flat piece 30. The flat piece 30 is generally parallel to the base plate 12 ....
 
 
 34
 '499 patent, col. 5, ll. 5-19. The text continues,
 
 
 35
 the saw blade 34 extends ... through an aperture such as slot 38 (FIG.3) in the skid plate 24.... The slot 38 is also generally rectangular in shape, and is placed on the flat piece 30 of skid plate 24.
 
 
 36
 '499 patent, col. 5, ll. 51-60.
 
 
 37
 The specification of the '499 patent elaborates on the details of the preferred skid plate, more particularly defining the structure in ways unrelated to the recited function. These additional structural aspects are not what the statute contemplates as structure corresponding to the recited function. For example, in the preferred embodiment, the skid plate runs beyond the leading edge and continues down the entire length of the saw blade in order to reduce wobbling of the cutting blade. Additionally, the skid plate of the preferred embodiment is sized such that it helps support the weight of the saw. These structural aspects are thus not the means by which the saw "supports the surface of the concrete" and accordingly are not to be read as limiting the scope of the means clause. The corresponding disclosed physical structure is the skid plate, a generally flat hard plate that straddles the leading edge of the cutting blade. The district court's conclusion that the term "support surface" sufficiently identifies the structure is therefore erroneous.
 
 
 38
 Having identified the corresponding structure of the recited means, the next question is whether the wheels of the accused device are equivalent to that structure. "[S]ection 112, paragraph 6, rules out the possibility that any and every means which performs the function specified in the claim literally satisfies that limitation." Pennwalt Corp., 833 F.2d at 934, 4 USPQ2d at 1739. The proper test is whether the differences between the structure in the accused device and any disclosed in the specification are insubstantial. See Valmont Indus., Inc. v. Reinke Mfg. Co., 983 F.2d 1039, 1043, 25 USPQ2d 1451, 1455 (Fed.Cir.1993) ("In the context of section 112, however, an equivalent results from an insubstantial change which adds nothing of significance to the structure, material, or acts disclosed in the patent specification."); Alpex Computer Corp. v. Nintendo Co., 102 F.3d 1214, 1222, 40 USPQ2d 1667, 1673 (Fed.Cir.1996) (noting that equivalents under § 112, p 6, and under the doctrine of equivalents both relate to insubstantial changes), cert. denied, --- U.S. ----, 117 S.Ct. 2480, 138 L.Ed.2d 989 (1997).
 
 
 39
 Cardinal argues to us that the question whether a particular accused structure is equivalent to the disclosed structure is a question of law. The district court did not expressly decide this issue and on the facts of this case it is unnecessary for us to resolve it as well. Because, as discussed below, in any event, no reasonable jury could have found that the accused device has an equivalent to the disclosed structure, we need not resolve the question expressly left open by our in banc court in Markman, "whether a determination of equivalents under § 112, para. 6 is a question of law or fact." Markman, 52 F.3d at 977 n. 8, 34 USPQ2d at 1327 n. 8.
 
 
 40
 Cardinal argues that the wheels of its device are not equivalent to the disclosed skid plate because they are rotatably mounted. It asserts that for a structure to be equivalent to a skid plate, it must include substantially all of the structural features of a skid plate, and thus must be hard, flat, and fixedly attached to the saw. Chiuminatta responds that the district court properly held the wheels of the accused device to be within the scope of the claims. Chiuminatta asserts that the differences between the skid plate and wheels are insubstantial, and that an equivalent structure need not be flat or fixedly attached. Chiuminatta argues that the wheels of the accused device are equivalent because "in use, the [accused] wheels compress to form flattened planes on each side of the saw blade, coinciding with the structure of a skid plate."
 
 
 41
 The fundamental flaw in Chiuminatta's argument is that "flattened planes" are not structure. The undisputed structure that produces the concededly identical function of supporting the concrete consists of soft round wheels that are rotatably mounted onto the saw. The assertedly equivalent structures are wheels, and the differences between the wheels and the skid plate are not insubstantial. The former support the surface of the concrete by rolling over the concrete while the latter skids. The former are soft, compressible, and round; the latter is hard and predominantly flat (albeit with rounded edges to prevent gouging of the concrete). Additionally, the wheels rotate as opposed to skid as the saw moves across the concrete and thus have a different impact on the concrete. Since the wheels and the skid plate are substantially different from each other, they cannot be equivalent, and no reasonable jury could so find.
 
 
 42
 Chiuminatta also argues that the wheels are equivalent to the skid plate because they are interchangeable; the alleged infringer's saw may be outfitted with a skid plate and the patentee's saw may be outfitted with the accused wheels. This argument is not persuasive. Almost by definition, two structures that perform the same function may be substituted for one another. The question of known interchangeability is not whether both structures serve the same function, but whether it was known that one structure was an equivalent of another. Moreover, a finding of known interchangeability, while an important factor in determining equivalence, is certainly not dispositive. See, e.g., Graver Tank & Mfg. Co v. Linde Air Prods. Co., 339 U.S. 605, 609, 70 S.Ct. 854, 856-57, 94 L.Ed. 1097, 85 USPQ 328, 331 (1950) (stating in reference to the doctrine of equivalents that consideration "must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform. An important factor is whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was."). Such evidence does not obviate the statutory mandate to compare the accused structure to the corresponding structure. Moreover, Chiuminatta has not alleged that those of ordinary skill in the art recognized the interchangeability of metal plates with wheels for supporting the surface of concrete. Significantly, the patent discusses the use of wheels in the context of supporting and stabilizing the saw, but never once suggests that wheels could perform the function of the skid plate. Notwithstanding the discussion in the specification regarding the inherent drawbacks of a skid plate, including potential gouging of the concrete and increased drag against the concrete, there is no hint in the specification that the skid plate could be replaced by small wheels adjacent to the blade for supporting the concrete.
 
 
 43
 Because the wheels of the accused device are not equivalent to the skid plate disclosed in the '499 patent, the accused structure is not within the scope of the claim. Accordingly, the district court erred by granting Chiuminatta's motion for summary judgment of literal infringement.
 
 2. Doctrine of Equivalents Infringement
 
 44
 Chiuminatta argues that, should we rule against it on the question of literal infringement, we may affirm the district court under the doctrine of equivalents. Although the district court did not reach the issue because it found literal infringement, Chiuminatta argues that the undisputed evidence of record conclusively establishes that the wheels of the accused device differ from the patented invention only insubstantially. Such an assertion cannot succeed given our determination regarding literal infringement under § 112, p 6.
 
 
 45
 Although an equivalence analysis under § 112, p 6, and the doctrine of equivalents are not coextensive (for example, § 112, p 6, requires identical, not equivalent function) and have different origins and purposes, their tests for equivalence are closely related. Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, ----, 117 S.Ct. 1040, 1048, 137 L.Ed.2d 146, 41 USPQ2d 1865, 1870-71 (1997) ("[Equivalents under § 112] is an application of the doctrine of equivalents in a restrictive role, narrowing the application of broad literal claim elements. We recognized this type of role for the doctrine of equivalents in Graver Tank itself."). Both § 112, p 6, and the doctrine of equivalents protect the substance of a patentee's right to exclude by preventing mere colorable differences or slight improvements from escaping infringement, the former, by incorporating equivalents of disclosed structures into the literal scope of a functional claim limitation, and the latter, by holding as infringements equivalents that are beyond the literal scope of the claim. They do so by applying similar analyses of insubstantiality of the differences. Thus, a finding of a lack of literal infringement for lack of equivalent structure under a means-plus-function limitation may preclude a finding of equivalence under the doctrine of equivalents.
 
 
 46
 There is an important difference, however, between the doctrine of equivalents and § 112, p 6. The doctrine of equivalents is necessary because one cannot predict the future. Due to technological advances, a variant of an invention may be developed after the patent is granted, and that variant may constitute so insubstantial a change from what is claimed in the patent that it should be held to be an infringement. Such a variant, based on after-developed technology, could not have been disclosed in the patent. Even if such an element is found not to be a § 112, p 6, equivalent because it is not equivalent to the structure disclosed in the patent, this analysis should not foreclose it from being an equivalent under the doctrine of equivalents.
 
 
 47
 That is not the case here, where the equivalence issue does not involve later-developed technologies, but rather involves technology that predates the invention itself. In such a case, a finding of non-equivalence for § 112, p 6, purposes should preclude a contrary finding under the doctrine of equivalents. This is because, as we have already determined, the structure of the accused device differs substantially from the disclosed structure, and given the prior knowledge of the technology asserted to be equivalent, it could readily have been disclosed in the patent. There is no policy-based reason why a patentee should get two bites at the apple. If he or she could have included in the patent what is now alleged to be equivalent, and did not, leading to a conclusion that an accused device lacks an equivalent to the disclosed structure, why should the issue of equivalence have to be litigated a second time? As indicated, this consideration does not necessarily apply regarding variants of the invention based on after-developed technologies.
 
 
 48
 Our case law clearly provides that equivalence under the doctrine of equivalents requires that each claim limitation be met by an equivalent element in the accused device. Because this requirement is not met for § 112, p 6, purposes with respect to one limitation, it is therefore not met in this case for doctrine of equivalents purposes. An element of a device cannot be "not equivalent" and equivalent to the same structure. See, e.g., Dawn Equip. Co. v. Kentucky Farms Inc., 140 F.3d 1009, 1017-22, 46 USPQ2d 1109, 1115-18 (Fed.Cir.1998) (Plager, J., additional views).
 
 
 49
 In this case there can also be no doctrine of equivalents infringement because, as we have explained, the structure in the accused device, the wheels, operates in a substantially different way compared with the structure of the claimed device, the skid plate. The former support the surface of the concrete by rolling over the concrete while the latter skids. The former are soft, compressible, and round; the latter is hard and predominantly flat (albeit with rounded edges to prevent gouging of the concrete). Additionally, the wheels rotate as opposed to skid as the saw moves across the concrete and thus have a different impact on the concrete. The wheels flatten slightly, applying more localized pressure against the concrete than that produced by a hard flat skid plate. Accordingly, for this additional reason, it cannot be an equivalent under the doctrine of equivalents and the district court is directed to enter summary judgment of non-infringement. See Cool Fuel, Inc. v. Connett, 685 F.2d 309, 311 (9th Cir.1982) (noting that a court may sua sponte grant summary judgment to the non-moving party where the moving party cannot prove its case on the undisputed facts).
 
 B. The '675 Patent
 
 50
 The asserted claims of the '675 patent are directed to a method for cutting concrete at a time "before the concrete has hardened sufficiently to allow cutting by a conventional abrasive concrete saw, while still producing an acceptable surface finish adjacent to the cut groove." The claims further elaborate on the timing of the cutting. Claim 3, for example, states that it occurs
 
 
 51
 when the concrete has a hardness such that a 1.125 inch diameter steel rod with a flat end, and weighing about 5.75 pounds, would cause an indentation in the surface of the concrete of about 1/32 to 1/2 of an inch when the rod is dropped from a height of about 24 inches above the surface of the concrete.
 
 
 52
 During prosecution of the patent, Chiuminatta represented to the examiner that the upper limit of the claimed hardness range corresponded to approximately 1,200 psi (pounds per square inch).
 
 
 53
 Cardinal argues that genuine issues of fact preclude a finding of infringement of the method claims in the '675 patent, also asserting that there is no evidence that the accused saws are used during the claimed time period or that Cardinal induces its customers to use the saws during that time period. According to Cardinal, the advertisements for the accused saws state that they "are designed for sawing joints in green concrete as soon as the slab will support the weight of the saw and the operator." Cardinal asserts that in the concrete industry, concrete is considered sufficiently hard to support the weight of a person when a 170 pound person can step on it and make an indentation of 1/4 inch or less. Based on Chiuminatta's unchallenged assertions, that is equivalent to an indentation of 1-7/8 inch or less, when measured by the drop rod test recited in the claims. Cardinal claims that these advertisements therefore encourage use of the accused saws too early in the process of hardening to be within the scope of the claims.
 
 
 54
 This argument is without merit. Cardinal's advertisements concede the ability of the accused saw to cut concrete starting at a time period earlier than that claimed in the '675 patent, but they encourage use from that time period onwards and thus encourage use during the claimed hardness range. As the district court properly held, Cardinal has not raised a genuine issue regarding inducement of others to infringe the claims of the '675 patent.
 
 
 55
 Cardinal also challenges the validity of the '675 patent on the ground that its claims are indefinite and obvious. The indefiniteness challenge attacks the language in the claims specifying the proper timing for the cutting step. Specifically, Cardinal argues that the claims require the cutting step to occur at an indefinite time, when the concrete is not sufficiently hard for "conventional" saws to make an "acceptable" cut. We do not agree. The cutting step limitation has both qualitative and quantitative language. As illustrated by claim 3, quoted above, the hardness required by the cutting step is also bounded by the quantitative drop rod test and is thus not indefinite.
 
 
 56
 Cardinal also argues that the district court erred in its determination that no genuine issues of material fact precluded summary judgment on the question of obviousness. A determination of obviousness under 35 U.S.C. § 103 (1994) is a legal conclusion involving factual inquiries. See Uniroyal, Inc. v. Rudkin-Wiley Corp., 837 F.2d 1044, 1050, 5 USPQ2d 1434, 1438 (Fed.Cir.1988). In order for a claim to be invalid for obviousness over a combination of references, there must have been a motivation to combine the prior art references to produce the claimed invention. See Lindemann Maschinenfabrik GMBH v. American Hoist & Derrick Co., 730 F.2d 1452, 1462, 221 USPQ 481, 488 (Fed.Cir.1984).
 
 
 57
 One of the factual underpinnings of an obviousness determination is what a reference would have disclosed to one of ordinary skill in the art. See Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 693-94, 15 L.Ed.2d 545, 148 USPQ 459, 467 (1966); Panduit Corp. v. Dennison Mfg. Co., 810 F.2d 1561, 1579 n. 42, 1 USPQ2d 1593, 1606 n. 42 (Fed.Cir.1987). One of the prior art references, "the ACI Manual," states that concrete may be cut a mere four hours after it is poured if the concrete is hard enough not to be torn by a "conventional" saw. During reexamination of the '675 patent, the examiner initially rejected the claims as obvious over a number of references, including the ACI manual, which purportedly disclosed the cutting step. The claims were allowed after the applicant represented to the examiner that the concrete hardness disclosed in the ACI Manual is at least 1,500 psi. Cardinal argues that the patentee's representation regarding the prior art is incorrect because the prior art methods in fact cut concrete below 1,200 psi, which is below the upper limit of the claimed hardness range. Thus, Cardinal argues that the examiner's initial rejection was correct and that the allowance of the claims was clearly based on an erroneous view of the prior art.
 
 
 58
 The district court granted summary judgment for the patentee after determining that the cutting step was not even disclosed in the prior art. The court found that Cardinal failed to introduce evidence that would raise a genuine issue regarding the teachings of the ACI Manual. Cardinal asserts that this ruling was erroneous in light of its submission into evidence of a report entitled "Guidelines for Timing Contraction Joint Sawing and Earliest Loading for Concrete Pavements," published by the Department of Transportation, Federal Highway Administration, publication No. FHWA-RD-91-079, February 1994 (the report). The report, which is concededly not prior art, provides recommendations for cutting highway concrete. The "window of opportunity" for cutting concrete, the report states, is "as soon as the concrete has hardened sufficiently to permit sawing without excessive raveling" and "before random slab cracking can occur." The report compiles the results from numerous tests on a variety of concrete mixtures and contains an abundance of charts and graphs revealing a wealth of information regarding concrete strengths based on various mixtures and hardening time periods. Regarding the sawcutting tests, the report states that a "65-horsepower (48-kW) walk-behind saw was used for making sawcuts on the sawing strip slabs constructed during August 1989." The test results purportedly demonstrated that "acceptable" cuts were achieved on various concrete mixtures at hardnesses below 1,200 psi and between four and 24 hours after the concrete was poured.
 
 
 59
 The district court considered the report, but found that it was not relevant to the defense of obviousness. The court based its conclusion on the fact that the report describes a study performed after the filing date of the patents in suit and did not purport to be a survey of methods used in the prior art. Accordingly, the district court concluded that the report by itself did not refute applicant's statement to the examiner during reexamination that the ACI Manual inherently disclosed hardnesses above 1,500 psi. On the record before us, we find no error in the district court's grant of summary judgment. The report is insufficient to raise a genuine issue of material fact regarding the state of the prior art. It was incumbent upon Cardinal to support its opposition to Chiuminatta's motion for summary judgment with testimony, affidavits, or other evidence that demonstrated the relationship of the report to prior art cutting techniques. As Cardinal concedes, no evidence before the district court, if presumed true, established that the tests described in the report were indicative of work that existed in the prior art. On its face, the report merely purports to discuss the results of concrete cutting methods practiced after the filing date of the patents. Without supporting affidavits relating practices in 1989 to prior art practices, the report had little probative value. We agree with the district court that no reasonable jury could have found facts sufficient to render the claims obvious based solely on the prior art of record and the report.
 
 
 60
 We have considered Cardinal's arguments relating to the district court's ruling on Cardinal's inequitable conduct claim and to the district court's release of the preliminary injunction bond and find them to be unpersuasive. Accordingly, we do not disturb those rulings.
 
 CONCLUSION
 
 61
 The district court erred in granting summary judgment of infringement of the '499 patent. Under the correct claim construction, the means-plus-function limitation does not read on the accused device. Accordingly, the district court's grant of summary judgment of infringement of the '499 patent is reversed and the court is directed to grant summary judgment of non-infringement. The district court did not err in concluding that no issues of material fact precluded summary judgment on the '675 patent. Accordingly, the judgment regarding the '675 patent is affirmed.
 
 
 62
 AFFIRMED-IN-PART and REVERSED-IN-PART.